The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Mary Hoag and the briefs and argument of counsel on appeal. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through a Pre-Trial Agreement and at the hearing before Deputy Commissioner Hoag as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Defendant employer Tyson Foods is a duly qualified self-insured for the purposes of Workers Compensation coverage.
4. Two Form 22s were submitted.
5. The following medical records concerning plaintiffs injury and treatment were stipulated into the record:
a. Plaintiffs employment file containing his medical history (6pp.)
b. Barnett Family Practices release of Plaintiff from work
c. Elliot Springs Memorial Hospital records and discharge summary (9pp.)
d. Dr. D. Clemens evaluation (3pp.)
e. Charlotte Orthopedic Specialists medical records (4pp.)
f. Presbyterian Orthopedic Hospital medical records (2pp.)
g. Orthopedic Hospital of Charlotte operative report (2pp.)
h. Dr. Dardens medical records (8pp.)
i. Letter from Dr. Morris to Betsy Maness dated 9/16/93
j. Dr. Thomas Fleischers medical notes (7pp.)
k. Dr. Dardens releases of plaintiff from work (8pp.)
l. Physical therapy notes from Catawba Rehab Services (23pp.)
m. PT prescriptions from C.R.S. (5pp.)
6. The issues for consideration are:
a. Did plaintiff sustain a compensable injury on 28 April 1993?
b. Did plaintiff meet the requirements of N.C. Gen. Stat. 97-22?
c. Is plaintiff eligible for Workers Compensation benefits? If so, to what benefits is plaintiff entitled?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing plaintiff was fifty-nine years old and married. Plaintiff left school after completing the third or fourth grade, and is unable to read or write.
2. Plaintiff had been in the employment of defendant Tyson for approximately nine years, since 1985. At the time of his injury, plaintiff was employed as a "spotter, working primarily the second shift (3:00 p.m. to 11:30 p.m.) Plaintiffs duties included washing out and cleaning eighteen-wheeler refrigeration trucks, loading the trucks, checking their air conditioning units, tire pressure and diesel fuel, and refilling as needed. In the course of carrying out his duties, plaintiff was required to move the trucks as instructed by the dispatcher, and to close and to lock the insulated rear doors of the trucks when he was finished.
3. On 28 April 1993, plaintiff was working his usual shift. Between 8:00 p.m. and 9:00 p.m. plaintiff was attempting to close the rear doors on a refrigeration truck. Despite having been sent for repairs three times, the latch on the doors would not close properly. Plaintiff enlisted the assistance of a security guard to push against the door, while plaintiff stepped on the rear bumper of the truck and hit the latch with his left hand. In order to accomplish this maneuver, plaintiff had to raise his arm above his shoulder while balancing on the rear bumper of the truck. The door moved into place and plaintiff used a metal bar to pry the latch into the locked position. Immediately after striking the latch with his hand, plaintiff felt pain and a tingling sensation in his left arm.
4. Plaintiff called the dispatcher and went to defendant-employers medical department. He explained what had happened to the person on duty in the medical department, and requested something for his pain. Plaintiff purchased two Tylenol tablets.
5. Plaintiff finished his work shift, then returned home. He had difficulty driving his car due to the pain in his arm. When he arrived home he told his wife about the incident and the resulting pain. When he was unable to sleep that night, plaintiffs wife gave him two Tylenol.
6. Plaintiff reported to work the next morning at 7:00 a.m., planning to work a double shift. When he arrived he told the dispatcher that he needed to go to the medical department because his arm, shoulder, and chest were hurting, and he could not breathe. Plaintiff told the medical department personnel that he needed to go to see a doctor. One of Plaintiffs supervisors, Craven Walden, accompanied plaintiff to the parking lot.
7. Plaintiff drove himself to see his family doctor, Dr. John Willis, in Lancaster, South Carolina. Plaintiff told Dr. Willis that he had been experiencing pain in his left arm since the previous day, and that the pain had worsened. Dr. Willis examined plaintiff and diagnosed angina. Dr. Willis referred plaintiff to a cardiologist at the Barnett Family Practice in Lancaster, South Carolina.
8. Plaintiff was examined by Dr. W. A. Morris at the Barnett Family Practice. He was not given a specific diagnosis; however, an out-of-work slip dated 5 May 1993 and bearing the name of Barnett Family Practice physician Dr. W. Lee Thomas can be read as stating that plaintiff had a possible myocardial infarction or [emphasis added] a nerve root problem with an MRI pending. Plaintiff was referred to Elliott Springs Memorial Hospital, Inc., in Lancaster, South Carolina.
9. Plaintiff presented to Dr. J. A. Furse in the Elliott White Springs emergency room on 29 April 1993. Plaintiff was diagnosed with chest pain but no myocardial infarction, and also with neck pain due to a possible herniated nucleus pulposus.
10. Plaintiff next presented to Dr. W. L. Thomas with complaints of anterior chest pain and aching with some pain in the left neck and shoulder. Dr. Thomas had plaintiff examined by Dr. Khoury, Columbia Cardiologist, who diagnosed probable angina and recommended plaintiff be admitted to the hospital.
11. During this time, physicians who examined plaintiff were more concerned about a possible myocardial infarction (heart attack), a potentially life threatening situation, than a potentially herniated cervical disc. Plaintiff was confused about the diagnosis of his condition and understandably did not associate a myocardial infarction with a work-related arm injury.
12. Plaintiff was admitted to the hospital on 29 April 1993. An examination of plaintiffs chest through x-rays revealed that his heart was normal and his lungs were clear.
13. An orthopedic consultation with Dr. Holt was ordered. Dr. Holt diagnosed plaintiff as having a cervical disc prolapse and ordered conservative treatment including physical therapy. Plaintiff was released from the hospital on 4 May 1993 with prescriptions for DiaBeta, Zantac, Ativan, Naprosyn and Flexeril.
14. Plaintiff received an MRI at Piedmont Memorial Center on an outpatient basis on 4 May 1993. In addition, plain radiographs of the cervical spine were ordered for correlation with the MRI. A reading and evaluation of the two tests revealed cervical osteophytic spurring, mild disc stenosis and an absence of destructive lesions. Plaintiff had a definite disc herniation at the C4-5 level, with the appearance of disc material extending superiorly behind the C4 vertebra and disc protrusions/herniations noted at the C3-4, C5-6, and C6-7 levels.
15. Dr. Fleischer referred plaintiff to Dr. Bruce Darden of Charlotte Orthopedic Specialists. On 11 May 1993, Dr. Darden examined plaintiff who complained of neck pain and pain in both arms more severe on the left. He reported the onset of symptoms approximately two weeks earlier. Plaintiffs rotation to either side was fifty percent (50%) of normal. He also had a positive Spurlings maneuver bilaterally, decreased sensation in left triceps and thumb, and some diffuse numbness in both hands. Dr. Darden ordered EMGs and nerve conduction velocities of the left upper extremity to rule out cervical radiculopathy.
16. The EMG and nerve conduction velocities and an IV enhanced CT scan revealed most importantly an interforaminal discal herniation noted on the left at C6-7 compromising the exiting C7 nerve root, and a small interforaminal discal herniation on the right at C5-6, compromising the right exiting C6 nerve root.
17. On 24 May 1993, plaintiff underwent surgery performed by Dr. Darden and Dr. Stephen Smith for a microscopic anterior cervical discotomy and fusion at C6-7, and a right anterior iliac crest bone graft.
18. On 1 June 1993, plaintiff returned to Dr. Darden for a follow-up examination. Plaintiff reported decreased numbness and pain in his left arm and hand, with persistent slight triceps weakness. Plaintiff was given a hard Philadelphia collar to wear for his neck, and prescribed Naprosyn. Plaintiff, at this meeting, discussed with Dr. Darden his belief that the pain in his left arm had resulted from his attempt to close a truck door on 28 April 1993.
19. Plaintiff returned to Dr. Darden on 25 June 1993 complaining of increasing neck pain radiating into his shoulders and tingling into the fingers of his left hand beginning two days after he started wearing the Philadelphia collar. Plaintiff was placed in a soft collar and a physical therapy program for his left upper extremity was planned.
20. Plaintiff began physical therapy at Catawba Rehabilitation Services, Inc., on 29 June 1993, starting with left arm range motion strengthening modalities. Dr. Darden continued plaintiffs physical therapy with his last referral on 9 December 1993.
21. Plaintiff returned to Dr. Darden on 9 July 1993 with complaints of continued left arm pain and the onset of right arm pain above the elbow. Dr. Darden ordered a CT scan with contrast C4 to T1.
22. On 27 July 1993 plaintiff was admitted to Elliott White Springs Hospital by Dr. Darden. Dr. Darden examined plaintiff on 3 August 1993 and noted a mild limitation of cervical motion, pain with impingement testing as well as pain in both trapezii muscles when plaintiff tried to raise his arm overhead. Plaintiff also had decreased sensation in the left arm. X-rays of the right shoulder showed degenerative joint disease.
23. The CT scan performed on 16 July 1993 showed postoperative changes at C6-7 with anterior interbody fusion without incorporation. Physical therapy was continued, focusing on the trapezius area as well as neck range of motion.
24. By September 1993 plaintiff continued having some pain and numbness in his right arm, primarily in the trapezius and neck. Dr. Darden scheduled EMGs and nerve conduction velocities of the right upper extremity. The tests showed a possible peripheral neuropathy on the right in both the median and ulnar nerves. The right arm problems were not related to plaintiffs work-related injury.
25. On 29 October 1993 Dr. Dennis Clemens reviewed plaintiffs lumbar spine x-rays and noted a degenerative disc disease at L5-S1 with a focal central and right paramidline disc herniation at that level.
26. Plaintiff continued physical therapy and returned for regular visits with Dr. Darden. On 7 December 1993 plaintiff saw Dr. Fleischer with complaints of increasing pain in his lower back. When plaintiff failed to improve by 17 December 1993, Dr. Darden scheduled a total body bone scan. Dr. Dardens follow-up exam on 12 January 1994 showed minimal limitation of cervical motion and a negative Spurlings maneuver. EMGs and nerve conduction velocities of the right upper extremity showed possible cervical radiculopathy of either right C6 or C7. In the lumbar spine there was lumbar radiculopathy with denervation of the lumbar paraspinal musculature. The bone scan results showed increased activity over the right iliac crest.
27. Dr. Fleischer examined plaintiff again on 8 March 1994 and diagnosed significant spondylosis. Plaintiff suffered from cervical discectomy and had multiple level cervical disease and lumbar degenerative disc disease. Plaintiff was significantly impaired and Dr. Fleischer rated his chances of returning to the work force as minimal.
28. Following an examination of plaintiff on 29 July 1994, Dr. Fleischer determined that from an orthopedic standpoint, plaintiffs condition was unchanged and no further treatment was indicated.
29. Plaintiff received out of work authorizations from Dr. Darden beginning on 25 June 1993. The last authorization from Dr. Darden, dated 12 January 1994, released plaintiff from work for three months.
30. According to Dr. Darden, plaintiffs attempt to close the truck doors on 28 April 1993 could have caused plaintiffs neck, left arm and shoulder injuries. However, plaintiffs disc degeneration at C4-5, C5-6, and C7 was more likely than not normal wear and tear. The aging process causes degenerative disc disease and that trauma can cause it to be symptomatic.
31. Plaintiffs wife contacted defendant-employer on or about 29 April 1993 and informed defendant that plaintiff was in the hospital with a suspected heart attack. Defendant placed plaintiff on disability medical leave once the waiting period was met. Plaintiff and/or his wife met with Betsy Maness of Tyson each month in order to complete the paperwork required for the continuation of benefits to plaintiff.
32. Plaintiff had previously reported work-related injuries to the plant medical department on 4 May 1990, 7 March 1991, and 19 September 1992, but each of these incidents involved open, bleeding wounds requiring immediate treatment. Defendants workers compensation coordinator handled the necessary paperwork for the claims in these incidents.
33. Plaintiffs failure to report his injury to defendant in a timely manner is due to his lack of education, confusion resulting from the initial hospitalization for a possible heart attack, his lack of understanding of the causal relationship between the incident of hitting the truck door latch and the resulting injuries, and his reliance on his wife and Dr. Darden to notify defendant of the work-related injury. Defendant-employer was not unduly disadvantaged by plaintiffs tardy report of work related injury.
34. Plaintiffs did not inform defendant-employers benefit counselor of her husbands work-related injury because she thought her husband was hallucinating as a result of a heart attack, his medications, and no diagnosis of cervical disc herniation. Mrs. Peagler was experiencing difficulty in getting the company health insurance department to pay plaintiffs medical bills.
35. Betsy Maness, defendant-employers agent, completed all plaintiffs forms for medical leave of absence, but had little experience with and did not understand workers compensation claims. Ms. Maness never inquired as to whether plaintiffs injury was work-related, and always gave plaintiff and/or his wife the necessary forms for continuation of leave of absence when they appeared on the premises.
36. Plaintiff was never released to return to work at either light duty or full duty. On 9 November 1993, Dr. Darden provided plaintiff with a release from work authorization good through 14 December 1993. Dr. Dardens out-of-work authorizations for plaintiff continued through 12 April 1994.
37. Plaintiff sustained an injury by way of specific traumatic injury of the work assigned on 28 April 1993. Plaintiffs problems related to his left arm, shoulder and neck, involving the herniation of a cervical disc at C6-7.
38. Plaintiff has been out of work since 28 April 1993 and has not received any workers compensation benefits or earned wages of any kind. Plaintiff was terminated by defendant-employer on 29 April 1994 upon depleting his disability medical leave.
39. Defendant-employer has not provided plaintiff with any vocational counseling or rehabilitation services. There is no evidence of record that plaintiff is able to perform work of any kind or to earn wages of any kind. Moreover, there is no evidence of record that any job exists for which plaintiff is suited given his educational and physical limitations, age and experience.
40. Plaintiff contributed to defendant-employers disability plan, precluding the application of N.C. Gen. Stat. 97-42 for a deduction from compensation.
41. Plaintiffs average weekly wage at the time of the injury sustained was $497.21, yielding a compensation rate of $331.64.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 28 April 1993, plaintiff sustained a specific traumatic incident where he injured his cervical spine causing pain in his left arm, shoulder, and neck, while attempting to close the doors of a truck. N.C. Gen. Stat. 97-2(6).
2. Plaintiffs failure to timely report his injury to defendant is excusable due to his limited education, confusion resulting from the initial hospitalization for a possible heart attack, his lack of understanding the causal relationship between the incident of hitting the truck door latch and the resulting injuries, and his reliance on his wife and Dr. Darden to notify defendant of the work-related injury. Defendant was not unduly prejudiced by plaintiffs failure to timely file the Form 18 within thirty days after the injury. N.C. Gen. Stat. 97-22.
3. Plaintiff is entitled to receive temporary total disability compensation at the rate of $331.64 per week during the period of time from the date of injury on 28 April 1993 to the present, and continuing until further order of the Commission, subject to a reasonable attorneys fee under the Act. N.C. Gen. Stat. 97-29.
4. Defendant is required to pay any of plaintiffs outstanding medical bills related to his left arm, shoulder or neck, and for future medical treatment designed to effectuate a cure or give relief to his work-related injury to his left arm and cervical spine including the herniation of a disc at C6-7 and resultant surgery, therapy and checkups. N.C. Gen. Stat. 97-25.
5. Defendant is not entitled to a credit for the disability payments made to plaintiff, as plaintiff contributed to the policy. N.C. Gen. Stat. 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $331.64 per week during the period of time from the date of injury on 28 April 1993 through the time of the filing of this Opinion and Award, or for a period of 210 5/7 weeks, which has accrued. The aforementioned compensation shall be paid in a lump sum, subject to a reasonable attorneys fee. Defendant shall continue weekly compensation payments to plaintiff at the aforementioned rate until further order of the Commission, subject to a reasonable attorneys fee as set forth hereinafter.
2. Defendant shall pay any of plaintiffs outstanding medical bills related to his left arm, shoulder or cervical spine at C6-7, and for future medical treatment designed to effectuate a cure or give relief to his work-related injury.
3. A reasonable attorney fee of twenty-five percent of the compensation due under Paragraph 1 of this Award is approved for plaintiffs counsel and shall be paid as follows: 25% of the lump sum due plaintiff shall be deducted from the lump sum award and paid directly to plaintiffs counsel. For the remainder of plaintiffs continuing compensation, every fourth payment check shall be paid directly to plaintiffs counsel.
4. Defendants shall pay the costs due the Commission.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/__________________ CHRISTOPHER L. SCOTT COMMISSIONER
 S/____________ DIANNE SELLERS COMMISSIONER